965 F.2d 1429
 WOODBRIDGE PLACE APARTMENTS, an Indiana Limited Partnership,
and Robert L. Jarrett, Plaintiffs-Appellees,
v.
WASHINGTON SQUARE CAPITAL, INCORPORATED, doing business as
Washington Square Advisers, Northern Life
Insurance Company and Ministers Life,
Defendants-Appellants.
WOODBRIDGE PLACE APARTMENTS, an Indiana Limited Partnership,
and Robert L. Jarrett, Plaintiffs-Appellants,
v.
WASHINGTON SQUARE CAPITAL, INCORPORATED, doing business as
Washington Square Advisers, Northern Life
Insurance Company and Ministers Life,
Defendants-Appellees.
 Nos. 91-1347, 91-1379.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 3, 1991.
Decided June 8, 1992.
 
 David V. Miller (argued), David E. Gray and Greg A. Granger, Bowers, Harrison, Kent & Miller, Evansville, Ind., for Woodbridge Place Apartments, an Indiana Limited Partnership and Robert L. Jarrett.
 Robert H. Hahn, Bamberger, Foreman, Oswald & Hahn, Evansville, Ind.; Duane L. Paulson, Oppenheimer, Wolff & Donnelly; Lawrence C. Brown (argued), Faegre & Benson; and James E. Nelson, Northwestern Nat. Life Ins. Co., Minneapolis, Minn., for Washington Square Capital, Inc., Northern Life Ins. Co. and Ministers Life.
 Phillip E. Stano, Richard E. Barnsback and David M. Leifer, American Council of Life Ins., Washington, D.C., for American Council of Life Ins., amicus curiae.
 Before WOOD, Jr.,* MANION, and KANNE, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This controversy highlights the distinction between an option contract and a conditional bilateral contract, as well as breach and the failure of a condition precedent.
 
 
 2
 The lenders and borrower entered into an agreement where the lenders agreed to loan over 4.6 million dollars if certain conditions were satisfied on the date of closing. The loan never funded because some of these conditions were not satisfied. The borrower now asks this court to uphold the district court judgment requiring lenders to return the standby deposit that the borrower laid down when entering into this agreement. The borrower does not seem to argue that the contract's language contemplates such a return. Rather, the borrower argues that the law requires the return because the deposit is an unenforceable penalty. The lenders, on the other hand, argue that the deposit is enforceable under one of three theories: the deposit serves as consideration for an option contract; the deposit serves as consideration for the expense of the lender's loan commitment; or the deposit constitutes an enforceable liquidated damage provision.
 
 
 3
 The resolution of this case turns on the nature of the agreement between the borrower and lenders: whether the lenders provided the borrower with an option for a loan with the standby deposit serving as consideration for this option, so that only the lenders were bound to carry through with the loan; whether the parties entered into a conditional bilateral contract so that both sides were committed to perform assuming the satisfaction of the conditions precedent; or whether the parties entered into essentially two agreements, one agreement in which the lenders agreed to commit to loan a specified sum of money at a specified interest rate in exchange for the standby deposit, and one where both the lenders and the borrower agreed to carry through with the loan assuming the satisfaction of the conditions precedent.
 
 I.
 
 4
 In 1984 Woodbridge Place Apartments Limited Partnership ("Woodbridge Partnership") developed Woodbridge Place Apartments ("Woodbridge Apartments"), a 192-unit apartment complex in Evansville, Indiana. Woodbridge Partnership's sole general partner is Robert Jarrett. Late in 1986, Woodbridge Partnership decided to replace the financing on Woodbridge Apartments. For this purpose, Jarrett was introduced to Jerry Karem, a mortgage broker associated with Citizens Fidelity Bank of Louisville, Kentucky. Karem put Jarrett in contact with Washington Square Capital ("Washington Square"). In the negotiations with Jarrett, Washington Square acted on behalf of two lenders, Northern Life Insurance Company ("Northern Life") and Ministers Life Insurance Company ("Ministers Life"). All of Jarrett's dealings were with Karem; he had no direct contact with Northern Life, Ministers Life or Washington Square.
 
 
 5
 With Karem's assistance, Jarrett executed a mortgage application on behalf of Woodbridge Partnership. This application was dated January 20, 1987, and sent to Washington Square. This application requested Washington Square to arrange a mortgage loan commitment pursuant to the terms specified in the application. Washington Square conceded at oral argument that this application constituted a form application which it or the lenders drafted. This loan application set forth the basic format for the mortgage loan and it set forth the conditions necessary for the funding of the loan. Jarrett, acting on behalf of Woodbridge Partnership, simply filled in that information necessary to tailor this form to its needs. As such, with Karem's assistance, Jarrett filled in the requested loan amount of $4,665,000 for a term of 10 years at an interest rate of 9 1/4% based on a 30-year amortization schedule with Woodbridge Apartments serving as the mortgage security for this loan.
 
 
 6
 Paragraph 11(i) of this form application provides for a 3% standby deposit. A dispute over the nature of the standby deposit provided for in this paragraph is what brings the parties to this court. This paragraph reads as follows:
 
 
 7
 Refundable Standby Deposit and Inspection Fee: A Refundable Standby Deposit ("Standby Deposit") of 1% of the Loan amount is submitted with this Application, and an additional 2% of the Loan shall be paid within 5 days of our receipt of the Commitment to increase the Standby Deposit to $139,950. It will be transferred to the Lender and be refunded at a reasonable time after funding and receipt by Lender of the original Note and title policy. In the event we do not consummate the Loan in accordance with the Commitment, we [borrower] shall pay the fees and expenses of your Special Counsel, and further, we shall have no right to any refund of the Standby Deposit, and the same shall become the sole property of the Lender. In addition, an inspection fee of $500 has been enclosed to defray the cost of inspection of the Premises and Improvements, this Commitment being subject to Lender's inspection and approval of the Premises. If the Premises are not as described in the accepted submission, appraisal report or plans and specifications, this Commitment shall become null and void and the standby fee shall not be returned. However, should the Lender wrongfully refuse to fund the Loan, the Standby Deposit and inspection fee shall be refunded.
 
 
 8
 In filling out the loan application, Jarrett, acting on behalf of Woodbridge Partnership, typed in a modification to paragraph 11(i) which stated that, "In lieu of the 2% additional points, the Borrower will furnish the Lender with an irrevocable Letter of Credit in a form acceptable to the Lender." The lenders accepted this modification. Woodbridge Partnership deposited $46,650.00 with Washington Square on January 22, 1987.
 
 
 9
 After this payment of the initial 1% deposit and the filing of the application, a letter dated April 23, 1987, was sent to Woodbridge Partnership. This letter indicates that Northern Life and Ministers Life (the "lenders") agreed to make a mortgage loan pursuant to the application if Woodbridge Partnership agreed to the modifications outlined in the letter. Jarrett, acting on behalf of Woodbridge Partnership, made a few handwritten modifications to this letter, therefore accepting some but not all of these proposed modifications. Washington Square responded with a letter on May 19, 1987. This May 19th letter outlines Washington Square's position on the few remaining disputed terms. On June 3, 1987, Jarrett signed and returned, without modification, this May 19th letter. This consummated the agreement between the parties, the terms of which are set forth in the original loan application, the April 23rd, and May 19th letters.
 
 
 10
 After agreement was reached, Jarrett deposited a Letter of Credit secured by a certificate of deposit in the amount of $93,000.00. On June 12, 1987, Washington Square, acting on behalf of the lenders, sent a letter acknowledging both the existence of an agreement and the receipt of the remainder of the standby deposit.
 
 
 11
 According to the loan commitment, the loan was to fund by the close of July 1987. The loan agreement provided for numerous conditions which had to be satisfied in order for the loan to fund. The loan never funded because a few of these conditions were not satisfied, including an apparently significant condition--the minimum occupancy requirement. That is, Woodbridge Apartments did not meet the 93% minimum occupancy requirement at the time in which the loan was to close. The district court concluded that the lenders benefitted from the loan's failure to fund because interest rates increased between the time in which the agreement was entered and the closing date.
 
 
 12
 What is at issue is the whether or not Woodbridge Partnership is entitled to a return of the 3% standby deposit. Woodbridge Partnership brought suit requesting the return of $139,500.00 of this deposit, as well as prejudgment interest on the theory that this deposit constitutes an unenforceable penalty. The district court agreed that the deposit constitutes an unenforceable penalty and entered judgment for $139,500.00 in favor of Woodbridge Partnership. The district court, however, refused to award prejudgment interest to Woodbridge Partnership. Washington Square filed a timely notice of appeal with this court arguing that the agreement between the parties precludes return of the deposit and that this provision is enforceable because the standby deposit constitutes either an option, a commitment fee, or enforceable liquidated damages. Woodbridge Partnership cross-appealed for prejudgment interest.
 
 
 13
 The language of the contract does not resolve this dispute for us. Accordingly, we construe this document against its drafters and affirm that part of the district court decision which pertains to the return of the standby deposit. That is, we agree with the district court's conclusion that Woodbridge Partnership is entitled to a return of the standby deposit. However, considering that the defendants-appellants concede that if liable for the return of the standby deposit they are also liable for prejudgment interest, we reverse and remand that aspect of the district court decision pertaining to the award of prejudgment interest.
 
 II.
 A. Jurisdiction
 
 14
 This is an action based on diversity of citizenship under 28 U.S.C. § 1332(a). The district court entered final judgment in this case on January 10, 1991, and Washington Square filed a timely Notice of Appeal with this court. Therefore, we have jurisdiction over this action pursuant to 28 U.S.C. § 1291.
 
 
 15
 This diversity suit involves the interpretation of a contract between the parties. State law governs this issue of contractual interpretation, and the parties agree that Indiana law applies to this case.
 
 
 16
 Analyzing this case under Indiana law, however, has not turned out to be an easy task because the enforceability of standby deposits in the mortgage loan context is an issue of first impression in the Indiana courts. In diversity jurisdiction cases, Rule 52 of the Circuit Rules of the United States Court of Appeals for the Seventh Circuit provides this court with the discretion to certify dispositive questions of state law to the state's highest court in accordance with the rules of the state court. TransAmerica Ins. Co. v. Henry, 904 F.2d 387, 390 (7th Cir.1990). Rule 15(O) of the Indiana Rules of Appellate Procedure provides for certification when the Indiana Supreme Court has not decided the determinative question of Indiana law.
 
 
 17
 This court has been especially willing to certify questions when the issue before this court is one of first impression. See id. Nonetheless, fact specific, particularized decisions that lack broad, general significance are not suitable for certification to a state's highest court. Diginet, Inc. v. Western Union ATS, Inc., 958 F.2d 1388, 1395 (7th Cir.1992). This case requires the interpretation of a contract. Courts must look to the particularized language before it and the particularized negotiations between the parties in construing contractual documents. Cases involving the interpretation of contractual documents are, therefore, by nature particularized inquiries. For this reason, it is often difficult to discern any generalized principals from such cases--a fact demonstrated by the case before us today. While we agree that in the broadest sense the enforceability of standby deposits in the mortgage loan context is an important issue, we do not agree that the resolution of this case will have much impact on future cases involving this issue. Rather, as we emphasize below, this narrow decision is based on the particular language in the agreement before this court.
 
 
 18
 Moreover, while this case raises challenging questions of contractual interpretation, we find that Indiana's decisions in analogous cases and Indiana's general principles of contractual construction provide enough guidance. Therefore, we choose not to certify this issue regarding the enforceability of standby deposits in the mortgage loan context.
 
 B. Standard of Review
 
 19
 There seems to be some confusion with regard to this court's standard of review. As it turns out, the bulk of this decision's analysis focuses on questions of law reviewable de novo. Namely, much of the analysis involves the interpretation of contractual language and the application of rules of construction to guide this interpretation. Nonetheless, the defendants-appellants, Washington Square, Northern Life and Ministers Life (hereinafter collectively referred to as "Washington Square") seem to argue that the Supreme Court's decision in Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), requires this court to review de novo every aspect of a district court decision in a suit based on diversity of citizenship. Salve Regina does not require such a result.
 
 
 20
 It is a well-settled rule that appellate courts give discretion to a district court's factual findings because the district court, which sees the evidence and witnesses first-hand, is better able to weigh and assess the evidence. See Salve Regina, 111 S.Ct. at 1222. The ability of the district court to assess the evidence is the same in cases based on diversity jurisdiction as in cases based on federal question jurisdiction. Salve Regina did not change the traditional discretion afforded to a district court's factual conclusions. Indeed, Salve Regina, reaffirmed the need for such deference. Id. Salve Regina merely rejected the notion that a district court is in a better position than federal appellate courts to interpret the law of the state in which the district court sits. In short, Salve Regina simply stands for the proposition that appellate courts should apply the same standard of review in diversity cases as in federal question cases: legal determinations are reviewed de novo and factual determinations are reviewed under a clearly erroneous standard.
 
 
 21
 C. Ambiguous Nature of the Relevant Provision
 
 
 22
 What is at issue is the enforceability of the 3% standby deposit provision in a mortgage loan commitment. The parties seem to agree that the language of the loan commitment contemplates a refund in one situation: if the lenders wrongfully refuse to fund the loan. The plaintiffs-appellees, Woodbridge Partnership and Jarrett, (hereinafter collectively referred to as "Woodbridge Partnership") do not assert that the lenders wrongfully refused to fund this loan. Rather, Woodbridge Partnership argues it is entitled to a refund because this provision is a penalty provision--an unenforceable attempt to provide for damages. Washington Square, however, argues that this is not a penalty provision. Indeed, Washington Square argues that this provision is not a damage provision at all. Instead, Washington Square argues that the standby deposit constitutes consideration.
 
 
 23
 Washington Square sets forth two theories in support of its argument that the deposit fee constitutes consideration. One theory is that the deposit constitutes consideration for Washington Square's irrevocable offer to carry through with the loan if the conditions are satisfied. The second theory is that the deposit constitutes a "commitment fee" which serves as consideration for the risk that lenders incur in committing to fund a loan in the future at a specified interest rate. Alternatively, Washington Square argues that even if this is a damage provision, it is a reasonable and valid liquidated damage provision, not an unenforceable penalty provision.
 
 
 24
 Washington Square has presented us with some rather persuasive precedent to support its argument that this court should reverse the district court and enforce this standby deposit provision. In light of this precedent, we cannot deny that standby deposits are standard in the industry and the great majority of courts enforce such provisions under one of several theories. See, for example, In re Four Seasons Nursing Centers, Inc., 483 F.2d 599, 603 (10th Cir.1973) (upheld as a commitment fee); Goldman v. Connecticut General Life Ins. Co., 248 A.2d 154, 158-59 (Md.1968) (same); B.F. Saul Real Estate Inv. Trust v. McGovern, 683 S.W.2d 531, 534-35 (Tex.Ct.App.1984) (held that loan commitment was a unilateral agreement and the deposit constituted consideration for this agreement); Shel-Al Corp. v. American Nat'l Ins. Co., 492 F.2d 87, 93-96 (5th Cir.1974) (upheld as a liquidated damages); Frank's Nursery Sales, Inc. v. American Nat'l Ins. Co., 388 F.Supp. 76 (E.D.Mich.1974) (upheld as a liquidated damages after determining that borrower breached covenant to provide marketable title); Lowe v. Massachusetts Mutual Life Ins. Co., 127 Cal.Rptr. 23, 54 Cal.App.3d 718 (Cal.Ct.App.1976) (upheld under three theories: commitment fee, option or liquidated damages); and see generally Sonja A. Soehnel, Enforceability of Provision in Loan Commitment Agreement Authorizing Lender to Charge Standby Fee, Commitment Fee, or Similar Deposit, Annotation, 93 ALR.3d 1156 (1979). Although numerous courts have indeed upheld somewhat similar provisions in other loan agreements, the enforceability of deposits in the loan commitment context will depend on the wording of the particular agreement at issue. This means that we must look to the contract before us in deciding the enforceability of the standby deposit rather than relying on the general notion that courts enforce such provisions.
 
 
 25
 Respecting the freedom to contract, courts are generally reluctant to interfere with bargained-for agreements between parties. JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 14-31 (1987). This is particularly true in the consideration context where courts generally do not test the adequacy of a party's consideration. See, for example, id. at § 4-14; Harrison-Floyd Farm Bureau Co-op Assoc. Inc., v. Reed, 546 N.E.2d 855, 857 (Ind.Ct.App.1989). The damage context, however, is one area of contract law where courts are more willing to interfere with the terms of bargained-for agreements. CALAMARI, supra at § 14-31. Indeed, courts closely scrutinize damage provisions in order to determine if a contract's so-called damage provisions are in reality an attempt to assess penalties. Id. For this reason, the argument that $139,500.00 constitutes invalid consideration is less likely to prevail than the argument that $139,500.00 constitutes an unenforceable penalty. And, accordingly, the characterization of the standby deposit provision and the nature of this contract as a whole is essential to the resolution of this case.
 
 
 26
 We must first look to a contract's language in deciding any contract dispute. The problem is that the disputed provision fails to characterize the standby deposit as either consideration for an option, consideration for a commitment ("commitment fee"), or as a damage provision. Indeed, the standby deposit provision fails to use any one of numerous operative terms which might help to resolve this ambiguity. For example, this provision does not even mention such terms as consideration, commitment, fee, damage, or option.
 
 
 27
 Washington Square's failure to use any operative language indicating the nature of the standby deposit distinguishes this case from some of the other cases in which similar provisions were enforced as option contracts or commitment fees. That is, many of the cases which have upheld similar deposits under an option or commitment fee theory involved contracts which either labeled the deposit as a fee, or at least stated that the deposit constituted consideration. See, for example, Goldman, 248 A.2d at 158-59 (contract indicated that deposit constituted a fee); D & M Dev. Co. v. Sherwood and Roberts, Inc., 93 Idaho 200, 202, 457 P.2d 439, 441 (1969) (document labeled deposit as "consideration for your [the mortgage broker] obtaining written commitments for all three loans...."). We have no such language in this contract.
 
 D. Nature of the Agreement as a Whole
 
 28
 The fact that the relevant provision is ambiguous, however, is not determinative if the language of the agreement as a whole gives us some guidance as to the nature of this provision. First, we address whether the nature of this contract indicates that the standby deposit constitutes a commitment fee. If this deposit constitutes a commitment fee, then this means there are essentially two contracts between the parties: one contract in which the lender agrees to commit funds for the future supported by the deposit as consideration, and one contract to loan money if certain conditions are met in exchange for the agreed interest of 9 1/4%.
 
 
 29
 Nothing in the nature of this bilateral contract indicates that the standby fee constitutes consideration for the lender's risk in committing funds in the future. Indeed, Washington Square has pointed to no contractual language indicating that the loan commitment constitutes essentially two contracts. For this reason, the structure of the agreement seems to dictate against such a conclusion.
 
 
 30
 Next, we must address whether the unilateral nature of this agreement indicates that the standby deposit constitutes consideration for an option contract. Washington Square argues it does.
 
 
 31
 Assuming arguendo that this is an option contract in which only Washington Square is obligated to carry through with the loan, Washington Square's argument that the standby deposit constitutes consideration for such an option is persuasive. This is especially true when we consider that under traditional contract theory some consideration is necessary to make an option contract enforceable. CALAMARI, supra § 2-25(b). Moreover, a damage provision has no place in this loan commitment if it truly constitutes an option contract because, as Washington Square has pointed out, damages are appropriate only when there is a breach of contract. See, for example, Ryan v. Superior Oil Co., 813 S.W.2d 594, 596 (Tex.Ct.App.1991); Madonna v. Giacobbe, 190 Ill.App.3d 859, 138 Ill.Dec. 90, 95, 546 N.E.2d 1145, 1150 (1989); B.F. Saul Real Estate, 683 S.W.2d at 534. Failure to exercise an option does not constitute breach.
 
 
 32
 The problem, however, is that it is far from clear whether or not this loan commitment constitutes an option contract or a conditional bilateral contract. The agreement's language fails to resolve this issue because the drafters of this agreement not only failed to specify the nature of the standby deposit, but the drafters also failed to specify whether or not the agreement between the parties constitutes an option contract or a bilateral conditional contract.
 
 
 33
 In order for the loan commitment to constitute an option agreement, the loan commitment must be one in which binds the lenders and not the borrowers. In other words, if both the borrower and lenders are bound to carry through with the loan upon satisfaction of the specified conditions, then the loan commitment could only be a bilateral conditional agreement. Under such a reading the option theory fails. See B.F. Saul Real Estate, 683 S.W.2d at 534 (relied on the fact that only the lender was obligated to carry through with the loan commitment in concluding that the standby deposit constituted consideration). Recognizing this fact, Washington Square asserts that the agreement between the parties did not obligate the borrower to carry through with the loan. However, the agreement's language offers no definitive support for this proposition because the loan application and the accompanying letters fail to indicate whether the borrower is bound to accept the loan if the conditions are met. Indeed, one reasonable reading of this loan commitment leads to the conclusion that the borrower has covenanted to make a good faith effort to satisfy the conditions and that the borrower is obligated to carry through with the loan if the conditions are satisfied.
 
 
 34
 It appears that confusion over the unilateral versus bilateral nature of mortgage loan commitments is not new to the courts. In fact, in Lincoln National Life Insurance Co. v. NCR Corp., 772 F.2d 315, 319 (7th Cir.1985), this court noted the variety of holdings on this issue. Of course, the determination of the unilateral versus bilateral nature of the agreement will differ depending on the wording of the agreement before the court. Nonetheless, when a loan commitment's language fails to resolve the ambiguity some jurisdictions tend to presume that loan commitments are bilateral conditional contracts and some tend to presume that loan commitments constitute irrevocable offers. For example, New York courts apparently presume that loan commitments constitute bilateral agreements. See, for example, Murphy v. Empire of America, FSA, 746 F.2d 931, 934 (2d Cir.1984). Other jurisdictions seem to presume that ambiguously worded mortgage loan commitments constitute option contracts in which only the borrower is obligated. See, for example, B.F. Saul Real Estate, 683 S.W.2d at 534; Lowe, 127 Cal.Rptr. at 28-29; 54 Cal.App.3d at 729-30. Moreover, a third interpretation of ambiguously worded loan commitments is that neither side is bound. This was the interpretation that this court adopted in Runnemede Owners, Inc. v. Crest Mortgage Corp., 861 F.2d 1053, 1056-57 (7th Cir.1988), when construing a loan commitment under Illinois law.
 
 
 35
 We have found no cases, nor has either party cited any cases, where the Indiana courts have considered the unilateral versus bilateral nature of mortgage loan commitments. However, the district court in Lincoln National Life Insurance Co. v. NCR Corp., 603 F.Supp. 1393 (D.C.Ind.1984), affirmed on other grounds, 772 F.2d 315 (7th Cir.1985), interpreted a loan commitment under Indiana law. In that case the district court construed the document against the drafter in order to find that the contract was binding on both parties.[1]
 
 
 36
 Although the Indiana courts have not addressed whether ambiguously worded loan commitments are generally construed as bilateral agreements or option agreements, the Indiana courts have addressed similar issues in the real estate context. That is, the Indiana courts have in several instances construed conditional real estate sales contracts as bilateral agreements rather than option contracts. Keliher v. Cure, 534 N.E.2d 1133, 1138 (Ind.Ct.App.1989); Billman v. Hensel, 181 Ind.App. 272, 391 N.E.2d 671, 673 (1979).
 
 
 37
 The real estate sales agreements in Keliher and Billman involved mutually executed agreements where the seller obligated itself to sell certain property at a specified price if certain conditions were met, just as the mortgage loan commitment before us today constitutes a mutually executed agreement where the lender committed to loan funds at a specified interest rate at a certain date if certain conditions were met. Moreover, like the contract before us today, these real estate contracts did not specify whether or not the buyer was bound to the contract. And in both Keliher and Billman the agreements required an earnest money deposit, which is not unlike the standby deposit required in the loan commitment today.
 
 
 38
 In Keliher and Billman the Indiana Court of Appeals held that the real estate agreement constituted a bilateral agreement, meaning that the buyer was obligated to make a good faith attempt to meet the stated conditions and to carry through with the agreement if such conditions were met. Keliher, 534 N.E.2d at 1138; Billman, 391 N.E.2d at 673. But see Baker v. Townsend, 519 N.E.2d 192, 195 (Ind.Ct.App.1988) (did not imply that buyer had a good faith duty to satisfy finance condition under real estate sales agreement; did not address whether the contract otherwise constituted a bilateral or unilateral agreement). And in Keliher and Billman the Indiana courts held that the borrowers had breached their covenant of good faith, and therefore the disgruntled sellers were able to retain the earnest money deposits. Considering that the mortgage commitment at issue today is analogous to these real estate agreements, it is likely that the Indiana courts would apply the reasoning in Keliher and Billman to conclude that the mortgage loan commitment before this court today constitutes a bilateral agreement, whereby both parties are bound, as opposed to an option contract binding only the lenders. Accordingly, Indiana case law seems to frustrate, rather than support, Washington Square's argument that the loan commitment constitutes an option contract.
 
 
 39
 E. Standby Deposit Provision Constitutes a Damage Provision
 
 
 40
 The Keliher and Billman decisions not only support the general proposition that the loan commitment constitutes a conditional bilateral agreement as opposed to an option contract, but these cases more directly support the proposition that the standby deposit provision constitutes a damage provision, as opposed to one for consideration. Both of these decisions upheld the enforceability of earnest money deposits only after finding a breach of a conditional bilateral contract. Indeed, the court in Keliher, when distinguishing an earlier Indiana Court of Appeals decision, indicated that a seller could retain a security deposit if the buyer breached the real estate conditional sales agreement but that the seller could not retain the deposit if the sale fell through because of a failure of a condition precedent. Keliher, 534 N.E.2d at 1138. The fact that the retention of the deposit was contingent on breach indicates that this provision was viewed as one for damages.
 
 
 41
 We have already indicated that the conditional real estate sales agreements are somewhat analogous to loan commitments and earnest money deposits required in such agreements are somewhat akin to standby deposits. Following this analogy, it is likely that the Indiana courts would view standby deposit provisions as damage provisions when faced with ambiguous agreements. Nonetheless, the interpretation of a contract is often very case specific, and therefore this analogy is not complete. For this reason, we will not end our analysis here.
 
 
 42
 Extrinsic evidence and rules of construction are two vehicles for deciphering contractual intent from ambiguous documents. Tastee-Freez Leasing Corp. v. Milwid, 173 Ind.App. 675, 365 N.E.2d 1388, 1390 (1977). Resolving the nature of an ambiguous contract through extrinsic evidence is a factual determination which is evaluated under the clearly erroneous standard. See, for example, English Coal Co., Inc. v. Durcholz, 422 N.E.2d 302, 308-09 (Ind.Ct.App.1981) (citing Brumfield, Tr. v. State ex rel. Wallace, 206 Ind. 647, 190 N.E. 863 (1934)). The district court conducted a two-day trial in this case. However, the district court opinion does not indicate that it relied on evidence submitted during this trial in determining that the standby deposit provision constitutes a damage provision.[2] Rather, it appears that without explicitly stating so the district court followed the rule of construction which requires courts to construe agreements against the drafter. See District Court Memorandum at 5 ("The applicable clause here does not indicate that the deposit is a fee for either the issuance of the commitment to make the loan or as a fee for an option for the loan. If a mortgage lender wishes the deposit to be treated as such, it should state so in the refundable standby deposit clause."). Therefore, there is no factual finding to which we can give deference. And, in any event, it appears that the extrinsic evidence fails to resolve the issue either way because Indiana courts look to objective outward manifestations of contractual intent, not to some private intent of one of the parties. Crabtree v. Lee, 469 N.E.2d 476 (Ind.Ct.App.1984); Robinson v. Fickle, 167 Ind.App. 651, 340 N.E.2d 824 (1976). See also Western & Southern Life Ins. Co. v. Vale, 213 Ind. 601, 12 N.E.2d 350 (1938). The record contains no evidence indicating that the parties communicated their understanding of this provision to one another while negotiating the loan agreement.
 
 
 43
 Considering that the district court did not base its contractual interpretation on extrinsic evidence, we will turn to rules of construction. While the evaluation of extrinsic evidence to decipher the intent of an ambiguous contract is a question of fact, the application of rules of construction in order to interpret an ambiguous contract is a question of law for the courts reviewed de novo. See, for example, McGann & Marsh Co. v. K & F Mfg. Co., 179 Ind.App. 411, 385 N.E.2d 1183, 1187 (1979). Indiana courts invoke the cardinal rule of construction that, "[a]mbiguities in a contract are to be strictly construed against the party who prepared the contract." See, for example, Durcholz, 422 N.E.2d at 309 (citation omitted). The parties conceded at oral argument that either Washington Square or the lenders, not Woodbridge Partnership, drafted the form application which contained the bulk of the contractual terms between the parties. Construing the standby provision against the drafter leads to the conclusion that this ambiguously worded provision is a damage provision rather than a provision for consideration.
 
 
 44
 If this standby deposit was intended as consideration, it would have been easy for the lenders to state this in the loan application. And, if such an intent had been stated, or even hinted at, this would be an entirely different case. But, as it stands, the lenders never indicated in the contractual language or in the negotiations what purpose the standby deposit was intended to serve. Nor did the lenders indicate whether the agreement constituted an option contract or a conditional bilateral agreement.
 
 
 45
 The district court concluded that the lenders were not harmed by this loan's failure to fund. To the contrary, the district court indicated that the lenders benefitted from this failure because the interest rates went up, meaning that the lenders were able to lend money at a higher interest rate than that agreed to in the loan commitment with Woodbridge Partnership. These factual findings are supported by the record and we take these findings as true.
 
 
 46
 In light of the fact that the loan's failure benefitted the lender, we cannot help but wonder whether the lenders would be singing a different tune if the interest rates had gone down rather than up. What will happen in the next case where it is to the lenders' benefit to carry through with the loan? Will the lenders still be so willing to say that similar loan commitments made under the same form application constitute unilateral agreements where only the lenders are bound? Or, will the lenders adopt the argument made in Capital Holding Corporation v. Octagon Development Company, 757 S.W.2d 202 (Ky.Ct.App.1988); namely, will the lenders instead argue that the loan commitment constitutes a bilateral agreement enforceable against the borrower and the standby deposit is enforceable as a commitment fee for a separate agreement to hold the funds open for a specified period at a specified rate?
 
 
 47
 Of course, we could choose not to construe this agreement against the drafter and instead uphold this provision under the general theory that standby provisions are standard in the industry and routinely upheld by the courts. However, such a conclusion would allow the lenders to benefit from their poor draftsmanship. Indeed, such a holding would encourage future lenders to draft ambiguous agreements because these lenders would know that if pushed to litigation they could pick and chose the interpretation that best furthered their interests in any given factual situation. The drafter should suffer the consequences of poor draftsmanship, and we therefore interpret the standby deposit provision as a damage provision.
 
 F. Unavailability of Liquidated Damages
 
 48
 Now that we have determined that this is a damage provision, the next question is whether this can be enforced against Woodbridge Partnership as a liquidated damage provision in the context of this case. The district court held that this provision constitutes an unenforceable penalty provision. The district court reached this decision after concluding that this "provision does not attempt to secure an amount for the non-breaching party which is reasonably proportionate to the amount of actual damages likely to occur by failure of the loan to fund." District Court Memorandum at 7. We, however, need not address whether this provision is a valid liquidated damage provision because liquidated damages are not available on the facts before this court.
 
 
 49
 Washington Square, in support of its earlier argument that the standby deposit served as consideration, emphasized that damages are only appropriate upon breach. We agree. See, for example, Ryan, 813 S.W.2d at 596; Madonna, 546 N.E.2d at 1150; and B.F. Saul Real Estate, 683 S.W.2d at 534.
 
 
 50
 In its decision the district court stated that, "For reasons not pertinent to this action, the plaintiff failed to satisfy the conditions of funding the loan." (Emphasis added.) The fact that the district court used the label "conditions" indicates that the district court viewed the failure to fund as a failure of a condition precedent, not as a breach of some covenant. The defendants-appellants have not challenged this characterization on appeal. That is, nowhere in their briefs do the defendants-appellants allege that Woodbridge Partnership breached its agreement with the lenders. It therefore appears that the defendants-appellants have conceded a point which is vital to their ability to retain a standby deposit on a damage based theory--a point apparently overlooked by both parties and the district court.
 
 
 51
 Not only does it appear that Washington Square has effectively conceded that the contract failed because of a failure of a condition rather than breach, the language of the contract also supports this conclusion. Both parties agree that at least one primary reason for the loan's failure to fund was that Woodbridge Apartments, the proposed security for the mortgage loan, dipped below the required 93% minimum occupancy rate. The provisions which outline this minimum occupancy requirement are contained in Schedule I of the loan commitment. Paragraph 2 of this schedule refers to these occupancy requirements as "conditions." We see no reason not to hold the drafters to this chosen label. Granted, courts sometimes, in order to avoid forfeiture, interpret provisions labeled as conditions as covenants. CALAMARI, supra at § 11-9. However, in this case no forfeiture will result if we construe this provision expressly labeled as a condition as such. Indeed, something akin to a forfeiture will result if we construe it otherwise. We, therefore, construe the minimum occupancy requirement as a condition, not a covenant.
 
 
 52
 The Indiana courts pointed out in Billman and Keliher that breach sometimes results from the failure of a condition precedent under the theory of implied covenants. See, for example, Keliher, 534 N.E.2d at 1138; Billman, 391 N.E.2d at 673. But see Baker, 519 N.E.2d at 195 (condition did not impose a covenant of good faith). For example, Indiana courts often imply a covenant of good faith when the satisfaction of a condition is within the control of one of the parties. See, for example, Keliher, 534 N.E.2d at 1138; Billman, 391 N.E.2d at 673. But see Baker, 519 N.E.2d at 195. In such situations, if the party in control fails to make a good faith effort to satisfy the condition, this party has breached the implied covenant. Nonetheless, the district court made no finding of bad faith, nor did the district court otherwise indicate that Woodbridge Partnership breached either an implied or express covenant. And, the defendants-appellants do not allege that the district court erred in failing to make such a finding. We must assume, therefore, that the contract failed because of a failure of a condition precedent, and not because of a breach of contract. Liquidated damages are therefore inappropriate. As such, the district court correctly ordered Washington Square to return the standby deposit.
 
 G. Response to Amicus Curiae Brief
 
 53
 The American Council of Life Insurance filed a brief as amicus curiae. In that brief, amicus pointed out that the insurance industry is a large provider of real estate mortgage loans and standby deposits are an integral aspect of these loans. Amicus argues that in today's market of fluctuating interest rates such deposits protect the lender from losses incurred when interest rates drop and the borrower walks away from the agreement: "borrowers would place the lending industry in a precarious situation if they could walk away from loan commitments whenever interest rates drop without forfeiting the standby deposit, but retain the benefit of financial commitments when interest rates rise." Brief of Amicus Curiae at 6. Amicus, therefore, predicts doom and gloom for the insurance industry if we refuse to enforce the standby deposit provision before us today.
 
 
 54
 However, we are not convinced that our narrow holding today will result in such dreary consequences. First, much of amicus's rationale assumes that borrowers are completely free to walk away from mortgage loan commitments. We have already indicated that this is not necessarily an accurate statement of the law, especially in Indiana where the courts are likely to hold that the borrower is bound to make a good faith effort to satisfy the conditions in the loan commitment and to follow through with the commitment once these conditions are satisfied. See Keliher, 534 N.E.2d at 1138; Billman, 391 N.E.2d at 673. Moreover, this decision in no way prohibits insurance companies from requiring standby deposits as either consideration for an option, consideration to commit money to the future at a locked-in interest rate, or for reasonable liquidated damages for the breach of an agreement. Today, we simply conclude under Indiana law that the drafter of a loan commitment must provide some hint as to the purpose of the deposit, and if we can find no hint of such a purpose in the provision at issue, the agreement as a whole, or in the extrinsic evidence, the document will be construed against the drafter. It is also important to note that, in construing against the drafter, this court did not hold that the attempt at providing for liquidated damages was invalid. Rather, we simply held that if a standby deposit is to serve as liquidated damages, the lender must somehow demonstrate that the borrower breached an implied or express covenant rather than conceding on appeal that the borrower merely failed to satisfy a condition precedent. We are sympathetic to the insurance industry's plight. Nonetheless, we do not see how our narrow holding today will result in doom and gloom for the insurance industry, especially considering that Indiana courts are not bound to this court's interpretation of Indiana law.
 
 III.
 
 55
 For the foregoing reasons, we affirm the district court so far as the district court ordered Washington Square to refund $139,500.00 of the deposit. However, considering Washington Square's concession on the issue of prejudgment interest, we reverse and remand that portion of the district court decision which pertains to the award of prejudgment interest. On remand, the district court should determine the appropriate amount of prejudgment interest owed to the plaintiffs-appellants.
 
 
 56
 Parties shall bear their own costs.
 
 
 57
 AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.
 
 
 
 *
 Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case
 
 
 [1]
 It is arguable that this court's decision in Stanish v. Polish Roman Catholic Union, 484 F.2d 713, 722-23 (7th Cir.1973) also construed a loan commitment as a bilateral contract under Indiana law. However, this court did not make it clear in that diversity case whether the result was reached under the laws of Indiana or Illinois
 
 
 [2]
 Although the district court did not rely on extrinsic evidence in deciding that the standby provision constitutes a provision for damages rather than one for consideration, the district court did look to the extrinsic evidence when it concluded that the provision constituted an unenforceable penalty as opposed to a valid liquidated damage provision