In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1290

DAVID N. RAIN and PARAMOUNT
INTERNATIONAL, INC.,

*Plaintiffs-Appellants,*

*v.*

ROLLS-ROYCE CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 07 C 1233-WTL-DML—**William T. Lawrence**, *Judge.*

ARGUED SEPTEMBER 14, 2010—DECIDED NOVEMBER 18, 2010

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* David Rain and Paramount Inter-
national, Inc. brought a breach of contract action against
Rolls-Royce Corporation, alleging that Rolls-Royce twice
breached a non-disparagement agreement the parties
executed in connection with the settlement of an earlier
lawsuit. The district court granted partial summary
judgment in Rolls-Royce's favor on one of the claims,

and, following a bench trial, entered judgment for Rolls-Royce on the second claim. For the following reasons, we affirm.

## I.  Background

### A.  Factual Background

Rolls-Royce manufactures a Model 250 aircraft engine for use in helicopters. Rolls-Royce has a number of "authorized maintenance centers" ("AMCs") and "authorized rework facilities" ("ARFs")—known as the "Model 250 FIRST Network"—that service, repair, and overhaul Model 250 engines around the world. David Rain is the sole shareholder and officer of Paramount International, Inc. ("Paramount"), which is in the business of selling parts for the Model 250 engine to, among others, the AMCs and ARFs in the FIRST Network. Therefore, Paramount and Rolls-Royce are direct competitors.

Rolls-Royce and Rain have a contentious history. In 2005, Rolls-Royce filed suit against Rain, Paramount, and others, alleging that they had misappropriated Rolls-Royce's intellectual property. On May 19, 2006, the parties executed a formal settlement agreement and dismissed the lawsuit. The agreement, which is governed by Indiana law, contains a non-disparagement provision stating: "None of the Parties will disparage the other." The agreement further provides that any material breach of the settlement agreement entitles the prevailing party to its attorney's fees plus damages in an amount not less than $1,000,000.

### 1. The 2007 Texas Lawsuit

In 2007, Rolls-Royce filed a complaint in the United States District Court for the Northern District of Texas, alleging that the defendants in that case had obtained Rolls-Royce's proprietary information from a New Jersey corporation—referred to as the "Principal Corporation"—owned by "Mr. Doe." The complaint asserted a RICO claim, in which Rolls-Royce alleged that the defendants had conspired with "Principal Corporation" and "Doe" to obtain and use Rolls-Royce's proprietary information. There is no dispute that, while Rain and Paramount were not named as defendants in the Texas suit, the complaint used the pseudonyms "Mr. Doe" and "Principal Corporation" to refer to Rain and Paramount.

### 2. The 2007 Helio-Expo

Also in 2007, Rain attended the Heli-Expo, an annual trade show sponsored by the Helicopter Association International ("HAI"). At the 2007 Heli-Expo, Rolls-Royce, the AMCs, and the ARFs sponsored a private customer appreciation event. The FIRST Network members purchased passes to the event from Rolls-Royce to give to their customers. Rain obtained a pass from an AMC and attended the event.

At the event, Rain spoke with various Rolls-Royce employees—including Scott Crislip, then the President of the Rolls-Royce Helicopter Division—without incident. While Rain was speaking with Rolls-Royce employee Tom Leonard, Jeff Edwards, a Rolls-Royce vice-president,

approached Rain. Concerned that Rain would "bait" a Rolls-Royce employee into making a disparaging comment about him, Edwards told Rain that his presence at the event was inappropriate, and asked him to leave. Both Leonard and another Rolls-Royce employee, Andrew Maasch, were in the vicinity while Edwards spoke to Rain. Rain exited the event through the hotel lobby, at Edwards's direction, and Edwards followed Rain out. On his way out, Rain passed a business associate, Eric Witters, and told Witters that he was "getting kicked out."

Another individual, Steve Van Hemert, also was asked to leave the event. Van Hemert is the general manager of a shop that services Model 250 engines. Representatives from the AMCs were upset that Rolls-Royce had asked some of their invited guests—for whom they had purchased tickets—to leave the event.

### B.  Procedural History

On September 25, 2007, appellants filed a breach of contract suit alleging that Rolls-Royce had breached the non-disparagement provision in the 2006 settlement agreement—once by including certain allegations in the Texas complaint, and again by escorting Rain out of the Heli-Expo event. The district court granted Rolls-Royce's motion for partial summary judgment as to the claim based on the Texas lawsuit, finding that even if Rolls-Royce disparaged appellants by accusing them of being involved in racketeering and other wrong-doing, Rolls-Royce was immune from liability under

Indiana's absolute litigation privilege. Following a bench trial on appellants' other breach of contract claim, the district court held that Rolls-Royce's treatment of Rain at the Heli-Expo event did not constitute disparagement in violation of the settlement agreement. In reaching that conclusion, the court looked to Black's Law Dictionary to identify the plain and ordinary meaning of the term "disparage," which it found to be: "[t]o dishonor (something or someone) by comparison" or "[t]o unjustly discredit or detract from the reputation of (another's property, product or business)." The trial judge found that while Rolls-Royce's action may have caused Rain embarrassment, it did not detract from his reputation as a businessman or reflect poorly on his character, his products or his business dealings, and thus did not constitute disparagement. Appellants timely appealed both rulings.

## II.  Discussion

### A.  Indiana's Absolute Litigation Privilege and the Texas Lawsuit

We review de novo a district court's grant of summary judgment. *See Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). A grant of summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). On appellate review, we review the facts and inferences in the light most favorable to the nonmoving party. *See Haefling v. UPS*, 169 F.3d 494, 497 (7th Cir. 1999).

"Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements." *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008). The purpose for the privilege is to "preserv[e] the due administration of justice by providing actors in judicial proceedings with the freedom to participate without fear of future defamation claims." *Id.* (citations and internal quotation marks omitted). In the words of one Indiana court, the privilege recognizes that the "public['s] interest in the freedom of expression by participants in judicial proceedings, uninhibited by the risk of resultant suits for defamation, is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of the individual to a legal remedy when he has been wronged." *Miller v. Reinert*, 839 N.E.2d 731, 735 (Ind. Ct. App. 2005) (citation omitted).

In determining whether a statement is relevant and pertinent, such that it is absolutely privileged, Indiana "courts favor a liberal rule." *Id.* Only those allegations that are "so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt [their] irrelevancy and impropriety" are not covered by the privilege. *Id.* The allegations at issue asserted that Doe and Principal (meaning Rain and Paramount) trafficked in intellectual property stolen from Rolls-Royce and formed an enterprise with the defendants in that case to replicate Rolls-Royce engine parts and undercut Rolls-Royce's business. There can be no doubt that those allegations were "pertinent and relevant to the [Texas]

litigation," as Fifth Circuit precedent required Rolls-Royce to allege the existence of an "enterprise" in order to plead its RICO claim. *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000). Moreover, because the alleged enterprise was an association-in-fact (as opposed to a legal entity), Rolls-Royce was required to "show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure." *Id.* at 441.

Thus, the requirements for applying Indiana's absolute privilege are satisfied—the allegations were made in the course of a judicial proceeding to which they were relevant. Appellants nevertheless contend that Rolls-Royce is not immune from liability because the privilege does not extend beyond defamation and other similar tort claims to encompass breach of contract claims. No Indiana court has addressed whether the absolute privilege precludes not only tort liability, but also contractual liability. Faced with a novel question of state law and no authority from the state courts, we shall "examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

Courts in a number of other jurisdictions have concluded that the absolute litigation privilege is applicable to breach of contract actions, at least where immunity from liability is consistent with the purpose of the privi-

lege. *See Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2004) (holding that Missouri's absolute privilege precluded liability for an alleged breach of a nondisparagement/ confidentiality agreement based on statements made in a judicial proceeding); *Ellis v. Kaye-Kibbey,* 581 F. Supp. 2d 861, 880-81 (W.D. Mich. 2008) (predicting that the Michigan Supreme Court would hold that the absolute litigation privilege "preclude[s] breach-of-contract liability [for] one who gives testimony or produces information in a judicial proceeding—at least to the extent that such action was necessary to comply with a subpoena or other order (and perhaps even if the communication was made in court in a judicial proceeding but not required by any subpoena or court order)"); *Wentland v. Wass,* 126 Cal.App.4th 1484, 1492 (Cal. App. Ct. 3d Dist. 2005) ("whether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege"); *Tulloch v. JPMorgan Chase & Co.*, 2006 WL 197009, at *5 (S.D. Tex. Jan. 24, 2006) (concluding that Texas law of absolute privilege bars all claims— regardless of the legal theories on which they are based—seeking "defamation damages," meaning damages for injuries "flowing from the communication of allegedly false statements during a judicial proceeding"). We find that approach to be sound and conclude that the Indiana Supreme Court would likely apply similar reasoning.

Therefore, the question becomes whether applying the litigation privilege in this case would promote the due administration of justice and free expression by partici-

pants in judicial proceedings. We conclude that it would. The application of the privilege here allows Rolls-Royce to pursue its claims against third parties without fear of future legal liability arising out of its efforts to protect its intellectual property rights. By contrast, the failure to apply the privilege would frustrate the underlying policy by discouraging Rolls-Royce from exercising its fundamental right to resort to the courts to protect its rights.

Appellants contend that Indiana's policy favoring the enforcement of contracts counsels against applying the litigation privilege here. Appellants waived this argument by failing to raise it before the district court. *See Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 608 n.4 (7th Cir. 2007). Moreover, we do not find appellants' argument persuasive. Appellants frame the inquiry as whether the non-disparagement provision is enforceable. But the agreement's enforceability is not at issue. Rather, the question is whether to impose liability for a violation of that agreement. Under the circumstances presented, we believe that the Indiana Supreme Court would refuse to impose liability based on the absolute litigation privilege. As noted above, applying the privilege here advances its underlying purpose. In addition, appellants' breach of contract claim is largely indistinguishable from a tort claim alleging injury flowing from statements made in a judicial proceeding. While appellants technically seek liquidated damages under the settlement agreement, any damages they suffered were caused solely by the fact that the statements were (allegedly) tortious. Consequently, imposing liability here would

allow appellants to circumvent the privilege by recasting what essentially is a tort claim as a breach of contract action.

Appellants also argue that Rolls-Royce waived the absolute privilege by agreeing to the non-disparagement clause. Because appellants did not raise a waiver argument below, they are barred from doing so here. *See Mote*, 502 F.3d at 608 n.4.

Finally, appellants request that we certify the question of whether Indiana's absolute litigation privilege applies to breach of contract claims to the Indiana Supreme Court. Certification is appropriate only when "'the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to [decide] . . . the issue.'" *State Farm Mut. Auto. Ins. Co. v. Pate,* 275 F.3d 666, 672 (7th Cir. 2001) (quoting *In re Badger Lines, Inc.,* 140 F.3d 691, 698-99 (7th Cir. 1998)). Even where, as here, "there is no clear guidance from a state court, . . . certification is neither mandated nor always necessary." *Id.* at 673. Because "the procedure is not without costs to the litigants and to the state court which already must contend with a crowded docket of its own[,] . . . we approach the decision to certify with circumspection." *Id.* at 671.

Under the circumstances of this case, we do not believe that certification is warranted. While the resolution of the question is outcome determinative, the question has not arisen before in Indiana's appellate courts. If

and when it arises again, the state courts will be free to reach their own conclusion, of course, and can tell us if our prediction of Indiana law was correct. Without seeing an obstacle to future state court resolution of the issue, we see no need to require the parties to go through another round of briefing and argument in this litigation. "Finally, although not a primary factor, we are entitled to take into account whether the request for certification to the state court came from the party who chose federal jurisdiction in the first place." *Brown v. Argosy Gaming Co., L.P.*, 384 F.3d 413, 417 (7th Cir. 2004). As we have explained, "it's not a proper alternative to proceeding in the first instance in state court to sue in federal court but ask that the suit be stayed to permit certifying the interpretive issue to the state court, thus asking that the suit be split between two courts." *Doe v. City of Chicago,* 360 F.3d 667, 672 (7th Cir. 2004). Here, appellants had the option of bringing their case in Indiana state court. That they chose to proceed in federal court undermines their request for certification.

## B. The Heli-Expo Incident

Following a bench trial, we review the district court's conclusions of law de novo and its findings of fact for clear error. *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000). Rain contends that the district court erred in reading the contract term "disparage" not to include the sort of personal embarrassment he suffered as a result of being escorted out of the Heli-Expo event.

Under Indiana state law, the court's goal in interpreting a contract is to "give effect to the parties' intent as reasonably manifested by the language of the agreement." *Reuille v. E.E. Brandenberger Constr., Inc.,* 888 N.E.2d 770, 771 (Ind. 2008). Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning. *Id.* In order to determine the plain and ordinary meaning of the term disparage, the district court looked to Black's Law Dictionary (7th ed. 1999), which defines "disparage" as "[t]o dishonor (something or someone) by comparison" or "[t]o unjustly discredit or detract from the reputation of (another's property, product or business)." Other courts applying Indiana law similarly have looked to dictionary definitions in order to discern the meaning of the contract term disparage. For example, in *Indiana Ins. Co. v. North Vermillion Community School Corp.*, 665 N.E.2d 630, 635 (Ind. Ct. App. 1996), the court relied on Webster's New World Dictionary to determine the meaning of "disparaging material" in the context of an insurance policy, concluding that "to disparage" means to "lower in esteem; discredit." Similarly, in *Heritage Mut. Ins. Co. v. Advanced Polymer Technology, Inc.*, 97 F. Supp. 2d 913, 932 (S.D. Ind. 2000), which also involved the interpretation of an insurance policy, the court considered three different dictionary definitions before concluding that "material that . . . disparages a person's or organization's goods, products or services" refers to material that "denigrate[s], discredit[s] or belittle[s] [another's] products." Finally, in *Westfield Ins. Co. v. Gil Behling & Son, Inc.*, 2010 WL 989933, at *12 (N.D. Ind. March 15, 2010), the

court relied on Black's Law Dictionary to conclude, in the context of yet another insurance policy, that "disparagement of goods, products, or services involves the denigration, discrediting, or belittling of a person's or organization's goods, products, or services."

We conclude that the Indiana Supreme Court would rely on dictionary definitions to find that the term "disparage," as it is used in the settlement agreement, means "to dishonor by comparison; to unjustly discredit or detract from the reputation of; to lower in esteem; to denigrate; to belittle." The real dispute, however, is whether the term "disparage" applies in the context of injuries to an individual's reputation (in a manner akin to the tort of defamation), or whether it refers more narrowly to assaults on one's reputation in the business or commercial context. The district court took the later approach, concluding that the "act of escorting Rain out of the event was not designed to, and in fact did not, detract from Rain's reputation as a businessman or carry with it any inherent message regarding his character, his products or his business dealings," and thus did not constitute disparagement. By contrast, Rain contends that his personal embarrassment can constitute disparagement.

We find that the meaning of the word "disparage" in the settlement agreement properly is limited to actions dishonoring, discrediting, denigrating or belittling the parties' economic, business or professional interests. As the case law discussed above indicates, the term disparage generally arises in the context of commercial

or professional interests. For example, in both *Heritage* and *Westfield*, the insurance policies at issue specifically referred to disparagement of "a person's or organization's *goods, products or services*." *See* 97 F. Supp. 2d at 932; 2010 WL 989933, at *12 (emphasis added).[1]

---

[1] Appellants rely on *Indiana Ins. Co.* for their contention that Rain's personal embarrassment constitutes disparagement. In *Indiana Ins. Co.,* the insured, a school, sued its insurer to recover the costs of defending a lawsuit brought by a former teacher. 665 N.E.2d 630. The teacher asserted a number of state law tort claims against the school, alleging that the school's actions had caused him humiliation, embarrassment, and a loss of standing and reputation within the school system and the community. *Id.* at 634. The school's insurance policy required the insurer to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury . . . sustained by any person or organization and arising out of . . . the publication or utterance of a libel or slander or of other defamatory or disparaging material." *Id.* at 633. The court concluded that the teacher's "allegations fit within the broadly written confines of 'other defamatory or disparaging material,'" and thus that the insurer had "a duty to defend the School against [the teacher's] claims." *Id.* at 635. Rain's reliance on *Indiana Ins. Co.* is misplaced for two reasons. First, the *Indiana Ins. Co.* court did not conclude that embarrassment constituted disparagement. Rather, the court concluded that the teacher's complaint—which included allegations of reputational harm— alleged the publication of " 'other defamatory or disparaging material.' " Under Indiana law, a statement is defamatory if it tends "to harm a person's reputation by lowering the

(continued...)

Furthermore, the other area of law in which the term "disparage" arises is in connection with the tort of product disparagement, which indicates that the word relates primarily to attacks on business interests as opposed to individuals. In *Sanderson v. Indiana Soft Water Services, Inc.*, 2004 WL 1784755 (S.D. Ind. July 23, 2004), then-district court Judge Hamilton considered a product disparagement claim asserted under Indiana law. Judge Hamilton noted that the tort, which "has also been described by commentators as 'disparagement of property,' 'slander of goods,' 'commercial disparagement,' 'trade libel,' and 'injurious falsehood[,]' . . . differs from defamation in that it seeks to protect economic interests rather than reputational interests." *Id.* at *7 (citing Prosser and Keaton on the Law of Torts § 128, at 963 (5th ed. 1984); Restatement (Second) of Torts §§ 623A, 624 (1977); *American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1323 (7th Cir. 1991) (applying Illinois and Ohio law)). Courts in other jurisdictions

---

(...continued)

person in the community's estimation or deterring third persons from dealing or associating with the person." *Kelley v. Tanoos*, 865 N.E.2d 593,596 (Ind. 2007) (internal citation omitted). Therefore, it seems likely that the court's decision was based in large part on the policy's inclusion of the word "defamatory," rather than on the term "disparaging." The contract provision at issue is not so broad; it is limited to disparagement. Second, the teacher in *Indiana Ins. Co.* alleged harm to his reputation in the school system, which conceivably could impact his professional prospects. Rain alleged no harm to his reputation as a businessman.

similarly have recognized that the tort of disparagement relates to business interests, not reputational ones. *See Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 506 (Colo. 2004) ("the tort of disparagement differs from defamation in that it focuses on the economic consequences of an injurious statement rather than on damage to reputation"); *Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 408 (E.D. Penn. 1983) ("[t]he cause of action for disparagement . . . protects economic interests by providing a remedy to one who suffers pecuniary loss from slurs affecting the marketability of his goods"); *Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) (the tort of business disparagement "is part of the body of law concerned with the subject of interference with commercial or economic relations"); *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974, 980 (10th Cir. 1995) (applying Kansas law and noting that the tort variously know as "'disparagement of property,' 'slander of goods,' 'commercial disparagement,' . . . 'trade libel' . . . [and] 'injurious falsehood' . . . has been broadly interpreted to include the publication of 'other falsehoods harmful to any legal interest of another that has pecuniary value'") (citations omitted).[2] Likewise, the Restatement, which refers to the tort as "injurious falsehood," contrasts actions for defamation, which "protect the personal reputation of the injured party," with actions for injurious falsehood, which "protect economic

---

[2] In *Bankwest*, the Tenth Circuit interpreted the phrase "other defamatory or disparaging material" in an insurance policy by looking to the scope of the commercial disparagement tort. 63 F.3d at 980.

interests of the injured party against pecuniary loss."
Restatement (Second) of Torts § 623A cmt. g.

In determining the intention of the parties to a
contract, Indiana courts—in addition to ascertaining
the plain meaning of the contract terms—have a "duty
to consider . . . the surrounding circumstances which
existed at the time the contract was made," including
"the nature of the agreement, together with all the facts
and circumstances leading up to the execution of the
contract, the relation of the parties, the nature and situa-
tion of the subject matter, and the apparent purpose of
making the contract." *Ruff v. Charter Behavioral Health
System of Northwest Indiana, Inc.*, 699 N.E.2d 1171, 1176
(Ind. Ct. App. 1998) (citation omitted). Here, the circum-
stances surrounding the execution of the settlement
agreement confirm our conclusion that the parties
intended the non-disparagement clause to protect their
business interests. In particular, the parties—direct busi-
ness competitors—executed the non-disparagement
clause as part of an agreement to settle a commercial
dispute concerning Rolls-Royce's intellectual property.[3]

For the foregoing reasons, we conclude that the Heli-
Expo incident did not constitute disparagement in viola-
tion of the settlement agreement because there is no
indication that Rain's business or his reputation as a

---

[3] Because of the commercial and competitive relationships
between the parties in this case, our predictions about the
limited meaning of the term "disparagement" in this context
would not necessarily extend to other contexts, such as
family law or other, more personal settings, in which parties
may agree not to "disparage" one another.

businessman was adversely impacted. To the contrary, the record evidence indicates that appellants' business associates, the AMCs, thought that Rolls-Royce was in the wrong for forcing Rain to leave the event.

Again, Rain asks this Court to certify a question to the Indiana Supreme Court—namely, what the proper definition of disparagement is under these circumstances. We decline that request. "[F]act specific, particularized decisions that lack broad, general significance are not suitable for certification to a state's highest court." *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1434 (7th Cir. 1992) (citing *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1395 (7th Cir. 1992)). Appellants' claim involves the interpretation of a contract, and the term "disparage" as it is used in that contract. "Cases involving the interpretation of contractual documents . . . by nature [involve] particularized inquiries," that turn on the specific contract language, and the circumstances surrounding the contract's execution. *Woodbridge Place Apartments*, 965 F.2d at 1434. Moreover, our interpretation of the term "disparage" lacks significance beyond this case, as it is limited to the term's use in the particular agreement at issue. Therefore, certification is not appropriate.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.