**In re LEATHERLAND CORP., d/b/a/ Leather Limited Debtor and Debtor in Possession.**

No. 03–31195.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Aug. 15, 2003.

Jerome Cox, Roetzel Andress, Akron, OH, Mardi Harrison, Doylestown, PA, Patricia B. Fugee, Toledo, OH, for Debtor.

Derrick Rippy, Office of the United States Trustee, Cleveland, OH, U.S. Trustee.

Christopher A. Jarvinen, Lawrence C. Gottlieb, Kronish Lieb Weiner and Hellman LLP, New York City, Drew T. Parobek, Matthew E. Albers, William E. Schonberg, Cleveland, OH, Raymond J. Pikna, Jr., Cincinnati, OH, for Creditor Committee.

### MEMORANDUM OF DECISION REGARDING UNSECURED CREDITORS' COMMITTEE'S LIMITED OBJECTION TO APPROVAL OF $280,000 PAYMENT

MARY ANN WHIPPLE, Bankruptcy Judge.

This case is before the Court on the Unsecured Creditors' Committee's Limited Objection to Approval of $280,000 Payment to Huntington National Bank [Doc. # 73], the responses filed by Huntington National Bank [Doc. # 104] and Debtor [Doc. # 98] and the Unsecured Creditors' Committee's reply [Doc. # 110]. At issue is a provision in a revolving credit agreement between Debtor and Huntington National Bank ("Huntington") for payment of a "Success Fee" equal to two percent of the

highest principal sum due under the note during the period from May 31, 2002, to January 31, 2003. The agreement provides that the "Success Fee" shall be waived if by December 31, 2002, and January 31, 2003, the outstanding principal amount due is reduced as required in the agreement.

The Unsecured Creditors' Committee ("the Committee") objects to payment of the "Success Fee," contending that (1) it represents an invalid penalty under Ohio law, and (2) under 11 U.S.C. § 506(b), the fee is unreasonable. Huntington contends that the "Success Fee" is consideration for an increase in the maximum revolving credit agreed upon in a third amendment to the amended credit and security agreement and, as such, is not a fee under § 506(b) and is not subject to a reasonableness determination.

On June 30, 2003, the Court heard oral argument on the issues raised by the parties as well as on issues the Court raised, including whether the § 506(b) reasonableness standard applies to fees that mature prepetition and the applicability of Ohio Rev.Code §§ 1109.18 and 1109.20 in determining the validity of the "Success Fee" provision. Based on the reasons and authorities set forth below, the Court will grant the Committee's objection.

### FACTS

The parties stipulated to the admission of six documents constituting the agreement between Debtor and Huntington. [Doc. # 105]. The following facts are set forth in those documents.

Debtor executed and delivered to Huntington a revolving note in the original principal amount of $21 million dated October 26, 2001 (the "Note"), payable in full on or before April 1, 2002. The interest rate was a variable rate equal to the London Inter–Bank Offered Rate ("LIBO") plus a LIBO rate margin of 2.25% if the outstanding principal sum was less than or equal to $15 million or 3% if the outstanding principal sum was greater than $15 million.[1] The default rate was the LIBO rate plus the applicable LIBO rate margin plus an additional 3%. Note, p. 2. The Note also provided that "[a]ny installment payment or other payment not made within 10 days of the date such payment is due shall be subject to a late charge equal to 5% of the amount of the payment." Note, p. 3.

The actual principal amount Debtor was eligible to borrow under the Note was conditioned upon the terms of a related Amended and Restated Credit and Security Agreement ("Loan Agreement") also dated October 26, 2001. Under the Loan Agreement, the maximum principal amount that Debtor was eligible to borrow under the Note was reduced contractually in specific increments from $21 million in 2001 to $4 million on March 25, 2002, until the maturity date on April 1, 2002. Loan Agreement, ¶ 1.31. Also pursuant to the Loan Agreement, Huntington obtained a security interest in Debtor's accounts, inventory, equipment, investment property and general intangibles. Loan Agreement, ¶ 5.1.

On April 22, 2002, Debtor and Huntington entered into the First Amendment to Note and Amended and Restated Credit and Security Agreement ("First Amendment"). On that date, the unpaid principal balance due under the Note and Loan Agreement was $12 million. First Amend-

---

**1.** The Note provides that the LIBO rate margin is 225 basis points if the outstanding principal sum was less than or equal to $15 million or 300 basis points if the outstanding principal sum was greater than $15 million. It further provides that 100 basis points equal one percent. Note, p. 2.

ment, Recitals D. The First Amendment fixed the maximum revolving credit under the Note and Loan Agreement at the credit balance and extended the maturity date to May 15, 2002. First Amendment, ¶¶ 2, 4. The contract interest rate was changed from a rate based upon the LIBO rate to the "Prime Commercial Rate" plus 1%. The default rate was amended to equal the contract rate (Prime Commercial Rate plus 1%) plus an additional 3%. First Amendment, p. 2. Huntington charged Debtor $500.00 for the First Amendment, plus all attorney fees incurred in connection with the amendment. First Amendment, p. 3.

On June 27, 2002, Debtor and Huntington entered into the Second Amendment to Note and Amended and Restated Credit and Security Agreement and Forbearance Agreement ("Second Amendment"). Debtor was in default under the terms of the Note and Loan Agreement and still owed a principal balance of $12 million. Second Amendment, Recitals G, H. The Second Amendment extended the maturity date to July 15, 2002. No changes in the interest rate were made. *See* Second Amendment, Article I. Article II of the Second Amendment contained the terms of the forbearance agreement.

On July 9, 2002, Debtor and Huntington entered into the Third Amendment to Note and Amended and Restated Credit and Security Agreement and Forbearance Agreement ("Third Amendment"). At that time, Debtor still owed a principal balance of $12 million. The Third Amendment incorporated by reference the Note, Loan Agreement and all previous amendments and provided that Ohio law would govern the agreement. Third Amendment, Article II, ¶¶ 21, 27. Article II of the Third Amendment contained the terms of the forbearance agreement. In consideration of the bank's forbearance, Debtor

agreed to pay Huntington "a non-refundable forbearance fee of $10,000," as well as the attorney fees related to negotiation and preparation of the amendment. Third Amendment, Article II, ¶ 5. In Article I, the Third Amendment extended the maturity date to March 15, 2003, and increased the contract interest rate to the Prime Commercial Rate plus 3% and the default interest rate to the contract rate (Prime Commercial Rate plus 3%) plus an additional 6%. Third Amendment, Article I, ¶¶ 1B, 2A. Huntington also agreed to amend the available maximum revolving credit to (i) $14 million until December 30, 2002, (ii) $4 million from December 31, 2002, until January 30, 2003, and (iii) $3 million until the maturity date. Third Amendment, Article I, ¶ 2B. Debtor agreed to incrementally reduce the principal balance due under the Note on a monthly basis beginning September 30, 2002, with the option of foregoing certain of those reductions by paying a $50,000 "non-refundable fully earned fee." *Id.* However, Article I, paragraph 2B further provided that if the unpaid principal sum was not reduced to $4 million or less by December 30, 2002, or if the unpaid principal sum was not reduced to $3 million or less by January 30, 2003, "the failure to make such Reduction[s] shall be a Default under this Agreement."

In addition, the Third Amendment provided that, in consideration of the $2 million increase in the maximum revolving credit, Debtor would pay a "line increase fee ('LIF') which shall be fully earned when paid." Third Amendment, Article I, ¶ 2G. The agreement provided that "[t]he initial draw under the Revolving Credit Facility which, after giving effect to the requested draw, increases the Maximum Revolving Credit from $12,000,000 up to $12,500,000 (or less) shall require the payment of a [line increase fee] in the amount of $70,000." *Id.* Similarly, for each incre-

ment of $500,000 (or less) which increased the Maximum Revolving Credit from $12,500,001 up to $14,000,000, Debtor was required to pay an additional $70,000. *Id.*

The Third Amendment also provided for payment of a "Success Fee." Specifically, the agreement provided as follows:

> *Success Fee.* In consideration of the increase in the Maximum Revolving Credit, Borrower shall pay to Lender on January 31, 2003, a Success Fee equal to two percent (2%) of the highest principal sum due under the Note during the period from May 31, 2002 and January 31, 2003. The Success Fee shall be waived by Lender and shall not be required to be paid if (i) at December 31, 2002, the outstanding principal sum due under the Note is $4,000,000 or less, and (ii) at January 31, 2003, the outstanding principal sum due under the Note is $3,000,000 or less.

Third Amendment, Article I, ¶ 2H.

The highest principal sum due under the Note between May 31, 2002, and January 31, 2003, was $14 million. Reeves Aff., ¶ 3.[2] Debtor failed to reduce the outstanding principal balance to $4 million by December 31, 2002, or to $3 million by January 31, 2003, as required under the Third Amendment. *Id.* ¶ 4.

Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 25, 2003. As Huntington and Debtor stipulated in the Interim Cash Collateral Order entered on March 5, 2003, Debtor's prepetition indebtedness to Huntington was an amount not less than

$6,319,393.10, consisting of the unpaid principal in the amount of $5,957,304.89, plus the "Success Fee" in the amount of $280,000, plus accrued but unpaid interest in the amount of $82,088.21. [Doc. # 47]. Huntington filed its proof of claim for this amount on June 30, 2003. Under the Court's cash collateral orders, Huntington has been paid its claim, except for the "Success Fee." The Court ordered Debtor to pay $280,000 into an escrow account at Huntington to be held pending determination of the objection.

### *LAW AND ANALYSIS*

### I. Overview

The Committee argues that Huntington is not entitled to the "Success Fee" because (1) under an analysis for rules governing liquidated damages, it represents an invalid penalty under Ohio law, and (2) under 11 U.S.C. § 506(b), the fee is unreasonable. Huntington counters by contending that the "Success Fee" constitutes consideration for an increase in the maximum revolving credit agreed upon in the Third Amendment and, as such, is not a fee under § 506(b) and is not subject to a reasonableness determination. It further argues that if consideration is a fee under § 506(b), it is reasonable. The Court construes the Committee's objection, although raised in the context of an objection to a motion to use cash collateral, as an objection to the allowance of Huntington's claim pursuant to Fed. R. Bankr.P. 3007. Allowance or disallowance of a claim against the

---

**2.** The Committee objected at hearing to the Reeves Affidavit, because it was not part of the stipulated basis upon which this dispute has been submitted to the Court. The Court overrules the Committee's objection, as the Debtor does not contest the accuracy of the facts in it in any respect. These facts are straightforward and part of the real basis for this dispute. The Court does not find unfair surprise or prejudice to the Committee in relying on the Affidavit, and in not permitting discovery to independently confirm the accuracy of facts not contested by the Debtor, as the party in the best position to dispute that it had not reduced the principal balance owed to Huntington as required by the Third Amendment.

estate is a core proceeding that this court may hear and determine. 28 U.S.C. § 157(b)(1) and (b)(2)(B).

The "Success Fee" became due and payable on January 31, 2003, before Debtor's bankruptcy petition was filed. There is no dispute that the value at the commencement of the case of Debtor's property in which Huntington had a security interest exceeded the amount of Huntington's claim, including the "Success Fee." Under 11 U.S.C. § 506(a), Huntington has a secured claim and under § 506(b), Huntington's claim is oversecured.[3] The Court must initially determine whether an oversecured creditor's claim for a fee that matured *prepetition* is subject to the § 506(b) reasonableness standard.[4] If § 506(b) does not apply, the Court must then analyze whether the fee is an allowed claim under 11 U.S.C. § 502. *See In re Hidden Lake Limited Partnership*, 247 B.R. 722, 727–28 (Bankr.S.D.Ohio 2000)(analyzes $2.7 million loan prepayment charge that matured prepetition, claimed by oversecured creditor, under

§ 502 and Ohio law of liquidated damages and penalties).

## II. Does 11 U.S.C. § 506(b) apply to prepetition fees and charges?

In determining the applicability of § 506(b), the Court's analysis begins with the plain language of the statute. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (where the statute's language is plain, the sole function of the courts is to enforce it according to its terms). Section 506(b) provides as follows:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Even though they all assert they are interpreting the plain meaning of the statute, other courts have arrived at differing con-

---

**3.** As the holder of an oversecured claim, Huntington would be entitled to postpetition interest on its claim to the extent of its equity cushion. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). As a result, the Court and the Committee agreed in the context of cash collateral proceedings that it was in the best interests of the Debtor and the estate to stop the accrual of postpetition interest under § 506(b), at the ultimate expense of the unsecured creditors, by payment of the undisputed amounts owed Huntington before any plan of reorganization is confirmed.

**4.** The applicability of § 506(b) dictates the balance of the Court's analysis. As explained below, the Court concludes that § 506(b) does not apply to the "Success Fee." But if § 506(b) did apply, then the Court would be required to decide which of two other interpretive paths to follow. As argued by the

Committee, some courts hold that one of the elements of applying § 506(b) to contractual fees is that the provision must also be enforceable under state law. Following that interpretive path, the Court's holding would be the same as the result it reaches here, because the Court finds that the "Success Fee" provision is a penalty unenforceable under Ohio law. On the other hand, and as explained at note five below, other courts hold that enforceability under state law is irrelevant in applying the reasonableness standard under § 506(b). *See Welzel v. Advocate Realty Investments, LLC (In re Welzel)*, 275 F.3d 1308, 1315 (11th Cir.2001) (distinguishes between enforceability and reasonableness). So if § 506(b) applies, the court would be required to decide whether state law must also be considered. Furthermore, deciding whether the fee is "reasonable" under § 506(b) would likely involve matters beyond the stipulated contract documents comprising the record now before the court and require an evidentiary hearing.

clusions as to whether § 506(b) applies to prepetition as well as to postpetition fees, costs and charges. *Compare In re Cummins Utility, L.P.,* 279 B.R. 195, 201 (Bankr.N.D.Texas) (applies only to postpetition fees), *and In re Vanderveer Estates Holdings, Inc.,* 283 B.R. 122, 131 (Bankr. E.D.N.Y.2002) (applies only to postpetition fees), *with Welzel v. Advocate Realty Investments, LLC (In re Welzel),* 275 F.3d 1308, 1314–15 (11th Cir.2001) (applying § 506(b) to prepetition and postpetition attorney fees), *and In re Center,* 282 B.R. 561, 565 (Bankr.D.N.H.2002)(same).

The Committee relies on the Eleventh Circuit's opinion in *Welzel* to support its position that the § 506(b) reasonableness standard applies to both prepetition and postpetition fees and charges claimed by oversecured consensual lienholders. In concluding that § 506(b) applies to prepetition attorney fees, the Eleventh Circuit reasoned that the subsection "refers blanketly to 'reasonable fees,' without differentiation based on the time the fees vested." *Welzel,* 275 F.3d at 1314. In addition, it noted that Congress "conspicuously" excluded interest payments on oversecured claims from the reasonableness standard of § 506(b). *Id.* Thus, the court reasoned that if Congress had intended to also exclude prepetition fees from the reasonableness standard, it would have explicitly done so. *Id.; see also In re Center,* 282 B.R. at 564 (finding that § 506(b) provides an exception to the basic rule set forth in § 502 for determining whether an oversecured creditor's claim for prepetition fees is allowable).

But other courts, also interpreting the plain language of § 506(b), have found that it applies only to fees accrued postpetition. In *In re Cummins,* the court found that, "on its face," the subsection "refers to interest and 'reasonable fees, costs or charges' which may be added to an 'al-lowed secured claim,'" thus finding that it relates only to postpetition accretions. *Cummins,* 279 B.R. at 201. It found that "[p]repetition interest and fees are allowable (if at all) as part of the underlying secured claim." *Id.; see also Vanderveer Estates Holdings, Inc.,* 283 B.R. at 131; 4 Collier on Bankruptcy ¶ 506.04[1] (15th ed. rev.2002). This interpretation comports more closely with the language in *Ron Pair Enterprises, Inc.,* where the Supreme Court explained, albeit in a different context, that "[s]ection 506(b) allows a holder of an oversecured claim to recover, *in addition to the prepetition amount of the claim,* 'interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.'" *Ron Pair Enterprises, Inc.,* 489 U.S. at 239–40, 109 S.Ct. 1026 (emphasis added). Similarly, in addressing whether a nonconsensual lienholder was entitled to recover postpetition interest and penalties, the Sixth Circuit has explained that "[l]ike consensual lienholders, nonconsensual oversecured lienholders *are entitled to interest, penalties, fees, and costs which accrue pre petition;* but the only allowable *post* petition addition for nonconsensual lienholders is interest, which is a compensatory claim." *Bondholder Committee v. Williamson County, Tennessee (In re Brentwood Outpatient, Ltd.),* 43 F.3d 256, 263 (6th Cir.1994)(emphasis added); *see also Rushton v. State Bank of Southern Utah (In re Gledhill),* 164 F.3d 1338, 1340 (10th Cir.1999)(stating that under § 502(b), holders of oversecured consensual and nonconsensual liens "are entitled to interest, penalties, attorney fees, and costs that accrue *before* the debtor's bankruptcy petition is filed," while interest and fees that accrue postpetition are permitted only if authorized under § 506(b)). And notwithstanding the lack of explicit timing language in § 506(b), upon which the *Welzel* court heavily relied,

courts including the Supreme Court commonly refer to § 506 as governing entitlement to "postpetition" interest, fees and charges in many contexts. *See, e.g., Timbers,* 484 U.S. at 372–73, 108 S.Ct. 626; *Rake v. Wade,* 508 U.S. 464, 468, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993)(§ 506(b) authorizes mortgage holder to collect postpetition interest on prepetition arrearages, *including interest and other charges,* in Chapter 13).

The Court finds the interpretation in the second line of cases to more accurately reflect the meaning of the plain language of § 506(b). The relevant phrase in that section is "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). "Such claim" refers to the "allowed secured claim" to the extent it is oversecured. *Id.* Thus, the starting point in the application of that section is the existence of "an allowed secured claim," which is determined by looking to applicable law. 11 U.S.C. §§ 506(b), 502(b)(1). A "claim" includes "any right to payment...." 11 U.S.C. § 101(5). The plain language of § 506(b) does not limit the definition of an "allowed secured claim" to include only the principal amount due. Rather, the "allowed secured claim" referred to in that section necessarily includes the principal as well as any interest and fees for which the creditor has a right to payment as of the time the bankruptcy petition is filed. *See* 11 U.S.C. § 502(b) (providing that the amount of the claim be determined as of the date of the filing of the petition). Section 506(b) then provides that a creditor may collect certain postpetition additions to the extent that its "allowed secured claim" is oversecured. Under this analysis, because Huntington's right to payment of the "Success Fee" under the Third Amendment matured before the filing of Debtor's bankruptcy petition, the fee is part of the underlying secured claim, the allowability of which is determined under § 502. Thus, § 506(b) has no bearing on the allowability of the "Success Fee."

■ To hold otherwise and apply the reasonableness standard of § 506(b) to fees and charges accrued prepetition would, as argued by Huntington, potentially cause absurd results. *See United States v. X–Citement Video,* 513 U.S. 64, 69–70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (rejecting construction of a federal statute that would produce absurd results.) For example, if a secured creditor is undersecured by one dollar, § 506(b) does not apply and the creditor has an allowed claim that includes all prepetition fees and charges that are enforceable against the debtor and property of the debtor under its agreement or applicable law. *See* 11 U.S.C. § 502(b). No additional reasonableness determination need be made. But if the secured creditor is oversecured by one dollar, the same prepetition fees and charges may not be allowed after subjecting them to the § 506(b) reasonableness standard. *Cf. Welzel,* 275 F.3d at 1319 (avoids reading of § 506(b) that would put oversecured creditor in worse position than unsecured creditor in allowance of attorney fees matured prepetition). The Court does not believe that Congress intended such an anomalous result. Rather, the purpose of § 506(b) is to permit a creditor to collect certain postpetition additions from the collateral securing its claim only to the extent that it is oversecured.

## III. Is the "Success Fee" allowable under 11 U.S.C. § 502?

### A. Burden of Proof

■ A proof of claim constitutes "*prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr.P.

3001(f). When an objection is filed, the objecting party bears the initial burden of producing sufficient evidence to rebut the presumption of validity given to the claim. *In re Nelson*, 206 B.R. 869, 878 (Bankr. N.D.Ohio 1997). The burden then shifts to the claimant to prove the validity and amount of the claim by a preponderance of the evidence. *Id.* While the burden of going forward shifts during the claims objection process, the ultimate burden of persuasion is always on the claimant to prove the claimed entitlement. *In re Holm*, 931 F.2d 620, 623 (9th Cir.1991).

In objecting to Huntington's claim for the $280,000 "Success Fee," the Committee has submitted the Note and loan documents at issue. While no factual issues are raised with respect to the allowability of the claim under § 502, the documents and arguments offered raise several matters of law that impact the validity of the claim. Thus, the documents offered are sufficient to overcome the presumption of validity. Consequently, the burden of going forward shifted back to Huntington to prove the validity of its claim. *See In re Lenz*, 110 B.R. 523, 525 (D.Colo.1990).

**B. § 502 Analysis**

■ Section 502(b) provides, in relevant part, that if an objection to a claim is made:

[T]he court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

Thus, by negative implication, the "Success Fee" must be allowed under § 502(b)(1) if it is enforceable against the debtor "under any agreement or applicable law...."

■ The "Success Fee" provision required payment of a fee only in the event that Debtor failed to reduce the outstanding principal in a timely manner as required under the Third Amendment, which event the amendment also defines as a default. Thus, the Committee argues and the Court agrees that the enforceability of the provision must be analyzed under Ohio's rules governing provisions for liquidated damages.[5]

■ Under Ohio common law, the validity of a liquidated damages clause depends on whether it operates as a penalty

**5.** The Committee's argument is actually in the context of a § 506(b) analysis. It contends that four conditions must be met under that section for the allowance of a fee, including that the charge is enforceable under the applicable state law governing the agreement. Although not relevant given the Court's determination that § 506(b) does not apply to prepetition fees, the Court notes that courts are not in agreement on that condition. Several courts have found a fee allowable under § 506(b) notwithstanding that it was unenforceable under state law. *See, e.g., Unsecured Creditors' Committee v. Walter E. Heller & Co. Southeast, Inc. (In re K.H. Stephenson Supply Co.)*, 768 F.2d 580 (4th Cir.1985) (finding fee agreement enforceable notwithstanding creditor's failure to comply with state law notice requirement); *First Western Bank & Trust v. Drewes (In re Schriock Construction, Inc.)*, 104 F.3d 200, 201–2 (8th Cir. 1997) (finding § 506(b) provides for fees notwithstanding state law rendering the fee provision void as against public policy); *In re Center*, 282 B.R. 561 (Bankr.D.N.H.2002) (allowing attorney fees even if otherwise unenforceable under state law); *In re A.J. Lane & Co.*, 113 B.R. 821 (Bankr.D.Mass.1990)(state law shall be ignored under § 506(b) in enforcing agreement for payment of fees and charges).

or a fair assessment of damages. *See Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 28–29, 465 N.E.2d 392, 393–94 (1984). Whether a provision is for liquidated damages or is a penalty is a question of law. *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 380, 613 N.E.2d 183, 187 (1993). " 'Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy.' " *Id.* at 381, 613 N.E.2d at 187 (quoting Restatement (Second) of Contracts § 356, Comment a (1981)). Unlike damages for breach of contract, the purpose of which is to compensate the nonbreaching party for losses suffered as a result of a breach, "[a] penalty is designed to coerce performance by punishing nonperformance; its principal object is *not* compensation for the losses suffered by the nonbreaching party." *Id.* at 381, 613 N.E.2d at 188. Thus, "[t]he characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." *Id.* (quoting *Garrett v. Coast & S. Fed. S. & L. Ass'n*, 9 Cal.3d 731, 739, 108 Cal.Rptr. 845, 850, 511 P.2d 1197, 1202 (1973)).

 In Ohio, a provision for damages is treated as an unenforceable penalty unless the following criteria are met:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the con-

clusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

*Samson Sales, Inc.*, 12 Ohio St.3d at 29, 465 N.E.2d at 394 (quoting syllabus in *Jones v. Stevens*, 112 Ohio St. 43, 146 N.E. 894 (1925)); *Easton Telecom Services, LLC v. CoreComm Internet Group, Inc.*, 216 F.Supp.2d 695, 698 (N.D.Ohio 2002). In applying the *Samson* analysis, a court must "construe the contract by its four corners in the light of the situation of the parties at the time of the execution of the contract." *Demczyk v. The Mutual Life Ins. Co. of New York (In re Graham Square, Inc.)*, 126 F.3d 823, 829 (6th Cir. 1997).

In this case, there is no indication in the Third Amendment that the "Success Fee" represents an amount of damages that were estimated and agreed upon by Debtor and Huntington. In fact, it does not estimate damages at all. The fee is contractually based on the highest principal sum borrowed during the ten-month period from May 31, 2002, to January 31, 2003, rather than on the unpaid principal due, or some percentage of the unpaid principal over the agreed upon balances, as of December 31, 2002, and January 31, 2003. Furthermore, any damages resulting from Debtor's failure to reduce its balance would not be uncertain as to amount or difficult to prove. Thus, the "Success Fee" provision does not meet the requirements of a valid liquidated damages provision, nor does Huntington even contend that it is a liquidated damages provision. The "Success Fee" is nothing more than a flat fee that constitutes a late penalty in that it did not become due and payable unless Debtor defaulted and failed to reduce its outstanding principal balance in a

timely manner as required by the agreement.

■ Although it is clear that Ohio common law regards a contract term that imposes a penalty for breach of the contract as unenforceable, *see DeCastro v. Wellston City Sch. Dist. Bd. of Educ.,* 94 Ohio St.3d 197, 201, 761 N.E.2d 612, 616–17 (2002), an issue exists as to whether this common law rule has been abrogated by statute. The Ohio legislature has enacted specific statutes dealing with, among other things, a bank's ability to collect various fees, including late fees and charges for exceeding a designated credit limit. Section 1109.20(A), Ohio Rev.Code, provides as follows:

A bank may contract for and receive interest or finance charges at any rate or rates agreed upon or consented to by the parties to the loan contract, extension of credit, or revolving credit agreement, but not exceeding an annual percentage rate of twenty-five percent. In addition, a bank may charge, collect, and receive, as interest, other fees and charges that are agreed upon by the bank and the borrower, including, but not limited to, periodic membership fees, cash advance fees, charges for exceeding a designated credit limit, charges for late payments, charges for the return of a dishonored check or other payment instrument, guarantee fees, origination fees, processing fees, application fees, and prepayment fees. Any fees and charges charged, collected, or received by a bank in accordance with this division shall not be included in the computation of the annual percentage rate or the rates of interest or finance charges for purposes of applying the twenty-five percent limitation.

In addition, Ohio Rev.Code § 1109.18(B) provides that "[t]he terms of a revolving credit agreement may permit the bank to charge, collect, and receive any finance charge or other fee or charge permitted by section 1109.20 of the Revised Code."

■ This Court has found, and the parties cited at oral argument, no Ohio case interpreting these statutes. Nevertheless, in Ohio, "the General Assembly will not be presumed to have intended to abrogate a common-law rule unless the language used in the statute clearly shows that intent." *Carrel v. Allied Products Corp.,* 78 Ohio St.3d 284, 287, 677 N.E.2d 795, 798 (1997). "[I]n the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force. 'There is no repeal of the common law in Ohio by mere implication.'" *Id.* at 287, 677 N.E.2d at 798–99 (quoting *Frantz v. Maher,* 106 Ohio App. 465, 472, 7 Ohio Op.2d 209, 213, 155 N.E.2d 471, 476 (1957)) (citation omitted).

In *Carrel,* the Ohio Supreme Court decided whether the common law action for negligent design survived enactment of the Ohio Products Liability Act, Ohio Rev. Code 2307.71 *et seq.* The supreme court considered several statutes that the appellee argued clearly expressed the General Assembly's intention that all product liability claims be brought pursuant to the Ohio Products Liability Act. First, it considered Ohio Rev.Code § 2307.71(M), which defines a products liability claim to include a claim that seeks to recover compensatory damages from a manufacturer for physical injury to person that allegedly arose from, among other things, the design of a product. *Id.* at 287–88, 677 N.E.2d at 799. Next, it considered Ohio Rev.Code § 2307.73, which provides that a manufacturer is subject to liability for compensatory damages based on a products liability claim if the claimant establishes that the product is defective as found within the specific subsection of the Act addressing

manufacture, design, warning or representation. *Id.* at 288, 677 N.E.2d at 799. And finally, it considered the provision in Ohio Rev.Code § 2307.72(A) that any recovery for compensatory damages on a products liability claim is *subject to* Ohio Rev.Code § 2307.71 to § 2307.79. *Id.*

Notwithstanding that the Products Liability Act defined a product liability claim to include claims for damages due to injuries caused by the design of a product, the supreme court rejected the appellee's argument that the Ohio Product Liability Act superceded a common law negligent design claim. The supreme court found that neither Ohio Rev.Code § 2307.71(M) nor Ohio Rev.Code § 2307.73 mention or otherwise discuss the common law action of negligent design and that there is no explicit statement that a negligent design claim may *not* be pursued. *Id.* It further found that the "subject to" language in § 2307.72(A) "is not strong enough to completely eliminate unmentioned common-law theories." *Id.* Thus, in *Carrel,* the supreme court strictly construed the statutes and indicated that it "recognizes nothing that is not expressed." *Id.; see also LaCourse v. Fleitz,* 28 Ohio St.3d 209, 503 N.E.2d 159 (1986) (finding that Ohio Rev. Code § 5321.04(A)(3), requiring a landlord to "[k]eep all common areas of the premises in a safe and sanitary condition," did not abrogate the long-standing rule of common law that a landlord has no duty to clear natural accumulations of snow and ice).

Applying the Ohio Supreme Court's rules of strict construction as set forth in *Carrel* and *LaCourse,* this Court finds that the language of Ohio Rev.Code § 1109.20 does not clearly express a legislative intention to abrogate Ohio common law. There is no mention at all of a bank's ability to collect a penalty. The Court construes the provision permitting banks to collect "charges for late payments," "charges for exceeding a designated credit limit" and "other fees and charges that are agreed upon by the bank and borrower" to include only fees and charges that constitute lawful liquidated damages. The Court rejects any construction that would impliedly allow a bank to collect a penalty that Ohio law has long held to be unenforceable as against public policy.

The legislative history of Ohio Rev.Code § 1109.20 supports the Court's statutory construction. Prior to 1991, the provisions for interest rates and fees allowed to be charged by banks were found in Ohio Rev. Code §§ 1107.26, 1107.261 and 1107.27. Section 1107.261 provided that "a bank may contract for and receive interest or finance charges at any rate or rates agreed upon or consented to by the parties to the loan contract or revolving credit agreement, but not exceeding an annual percentage rate of twenty-five percent." In 1991, the Ohio General Assembly enacted § 1107.262, which provided in subsection (A) that "[i]n addition to the interest or finance charges authorized under section 1107.26,[6] 1107.261, and 1107.27," [7] a bank may collect, "as interest, other fees and charges that are agreed upon by the bank and the borrower," including among other things, charges for late payments. Ohio H.B. No. 415. However, section 4 of H.B. 415 states that "[i]n enacting section 1107.262 of the Revised Code, the General Assembly intends divisions (A), (D), and (E) of that section as a clarification of

---

**6.** Section 1107.26, entitled "Special plan banking," provided for an interest rate "not to exceed one and one-half per cent per month."

**7.** Section 1107.27, entitled "Revolving Credit," provided that a bank may collect "a finance charge not in excess of an amount equivalent to one and one-half per cent per month."

existing law and *not as effecting any substantive change in existing law.*" [8] (Emphasis added).

▮▮▮▮ Nevertheless, Huntington disputes the contention that the fee at issue is a penalty. It argues that the "Success Fee" is simply consideration for increasing the maximum revolving credit as agreed upon in the Third Amendment, and as such the common law rules concerning liquidated damages and penalties do not apply. The Court finds this argument unpersuasive. In one sense, every covenant or promise set forth in a contract is made in consideration of the promises made by the other party to the contract, so the argument proves too much. *See* Third Amendment, p. 2 ("NOW THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein . . ."). And while the Third Amendment also separately states, apart from the standard recital of consideration in the preamble, that the "Success Fee" is "in consideration of the Maximum Revolving Credit," Third Amendment, Article I, ¶ H, the label placed upon a provision is not controlling in determining its character as a penalty or liquidated damages. *See Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 241, 513 N.E.2d 253, 256 (1987). Thus, a party cannot enforce an otherwise unenforceable penalty provision simply by labeling it "consideration." *But see Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1436, 1439 (7th Cir.1992)(court relies heavily on lender's failure to label standby deposit fee as "consideration" in holding it to be a damages provision).

The Court acknowledges that Huntington's argument has some support in the context of loan commitments and option

contracts. *See, e.g., id.* (in determining that standby deposit fee constitutes unenforceable damages clause under Indiana law, court also analyzes whether fee is in the nature of consideration for option); *Goldman v. Connecticut General Life Insurance Co.*, 251 Md. 575, 248 A.2d 154, 158 (1968)(loan commitment fee is unassailable consideration, not liquidated damages or penalty). In these contexts, the disputed fees are in the nature of consideration for holding open performance by one party, who will sustain costs that cannot be recouped if the loan is not actually extended or the option is not eventually exercised by the other party. As noted in *Woodbridge Place Apartments*, failure to exercise an option does not constitute breach of contract. *Woodbridge Place Apartments*, 965 F.2d at 1437.

The Third Amendment and the "Success Fee" are readily and materially distinguishable from these types of contracts and fees. First, the Third Amendment expressly defines the same conditions under which the "Success Fee" actually becomes due and payable as an event of default. Second, the Debtor actually borrowed funds from Huntington under the loan documents, with bilateral performance thus having occurred. Third, Huntington was compensated for holding open the maximum line of credit and for the Third Amendment through many other fee provisions in the contract. Huntington is mistaken to the extent that it implies that no consideration would be paid for the increase in the maximum revolving credit if the Court finds that the "Success Fee" cannot be recovered. The Third Amendment provides that Huntington receive an increase in the interest rate over that provided in the Second Amendment as well as

---

**8.** In 1996, § 1107.261 was repealed, the provision of former § 1107.261 was incorporated as the first sentence of § 1107.262 and

§ 1107.262 was renumbered as § 1109.20. *See* Ohio H.B. 538, §§ 1, 6, 7.

$280,000 in separate "line increase fees" as a result of Debtor's full use of the increase in maximum credit. Moreover, the Third Amendment provides for a $10,00 forbearance fee, a $50,000 line reduction waiver fee and Huntington's fees and costs for negotiation and preparation of the Third Amendment.

Furthermore, the Court rejects the bank's "consideration" argument to the extent that, although not so articulated by Huntington, it is arguing that the "Success Fee" is a fully earned fee and also for that reason should not be analyzed under the rules governing liquidated damages for breach of contract. Such an argument has been recognized as valid, also in the context of a lender's fee for its commitment to extend credit. *See, e.g., Demczyk*, 126 F.3d at 830 (finding that a loan commitment fee was not a penalty and remanding for determination of whether the fee was fully earned at the time the loan application was approved). In *Demczyk*, the bankruptcy court held on remand that a refundable commitment fee that was paid on approval of the debtor's loan application was fully earned by the lender. *Graham Square, Inc. v. The Mutual Life Ins. Co. of New York (In re Graham Square, Inc.)*, 224 B.R. 614, 617–18 (Bankr.N.D.Ohio 1998). In so finding, the court relied on the contract language at issue, which specifically provided that the fee was earned when the loan application was approved. It found the contract language was clear that the purpose of the commitment fee was to reimburse the lender for the expenses that it would incur in approving the loan application and holding itself ready and willing to make the loan to the debtor, whether the credit was ultimately extended or not. *Id.*

In this case, the contract language convinces the Court that the "Success Fee" provision is, and was intended to be, nothing more than a penalty for failure to pay down the principal balance by the deadlines established in the Third Amendment. Where Huntington and Debtor intended that fees paid were fully earned, the contract so stated in express terms. *See* Third Amendment, Article I, ¶ 2(B) (providing that the requirement to make certain reductions will be waived "upon the payment of a $50,000 non-refundable fully earned fee ...") and ¶ 2(G) (providing that "[i]n consideration of the increase in the amount of the Maximum Revolving Credit, Borrower shall pay to Lender a line increase fee ('LIF') which shall be fully earned when paid ...."). In contrast, Paragraph 2(H) of the Third Amendment, setting forth the terms for payment of the "Success Fee," contains no such language. Furthermore, the "Success Fee" was not even due and payable until and unless Debtor failed to reduce the outstanding principal sum as required by December 31, 2002, and January 31, 2003, events the contract expressly defined as a default.

The Court finds that the contract language is clear and unambiguous regarding the nature of the "Success Fee" as a penalty provision unenforceable under Ohio law, not as consideration or as an earned fee. As a result, the "Success Fee" is not part of Huntington's allowed claim under § 502(b) and Huntington it is not entitled to payment of the fee by Debtor.

The Court will enter a separate order in accordance with this memorandum of decision.